# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA,
### WESTERN DIVISION

KELLY STAFFORD, :
:
GRASS ROOTS :
NORTH CAROLINA, :
:
SECOND AMENDMENT : Civil Action No. 5:20-cv-00123
:
FOUNDATION, and :
: Memorandum of Law in Opposition
FIREARMS POLICY COALITION, : to Motion to Dismiss Complaint
INC., :
:
Plaintiffs :
:
v. :
:
GERALD M. BAKER, in his official :
capacity as Sheriff of Wake County, :
North Carolina, :
:
Defendant :

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... ii

TABLE OF AUTHORITIES ..................................................................................iii

INTRODUCTION ................................................................................................. 1

FACTUAL AND PROCEDURAL HISTORY ........................................................ 1

ARGUMENT ........................................................................................................ 4

   I.   Standard for Dismissal. ........................................................................ 4

   II.   Standard of Review. .......................................................................... 5

      A.  *Heller's* Categorical Ban Standard Controls. ................................... 5

      B.  Strict Scrutiny is the Only Possibly Applicable Measure of Any Tiered Scrutiny that May be Conducted. ...................................................... 8

      C.  Defendant Baker's Action Even Fails Intermediate Scrutiny. ..................... 11

         1.  Important Government Interest. ..................................................... 11

         2.  Fit Between the Asserted Interest and the Burden on Second Amendment Rights. ..................................................................................... 14

   III.   A Live Justiciable Case Remains with Fully Redressable Claims. ............. 17

      A.  Defendant Baker Cannot Carry His "Heavy Burden" of Proving Mootness Under the Voluntary Cessation Doctrine ............................................ 17

      B.  This Court Still Has the Power to Grant Meaningful and Effective Relief on Plaintiff's Claims ....................................................................... 21

CONCLUSION ................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page**

*Adams v. Bain*, 697 F.2d 1213 (4th Cir.1982) ............................................................... 6

*Adarand Constructors v. Slater*, 528 U.S. 216 (2000) ............................................... 18

*Bateman v. Perdue*, 881 F. Supp. 2d 709 (2012) ......................................................... 9

*Bates v. Little Rock*, 361 U.S. 516 (1960) .................................................................. 12

*Bd. of Trs. v. Fox,* 492 U.S. 469 (1989) ...................................................................... 12

*Brown v. Transurban USA, Inc.*, 144 F.Supp.3d 809 (E.D. Va. 2015) ...................... 23

*Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001) ............................................................................................................... 23-24

*Carey v. Piphus*, 435 U.S. 247 (1978) ......................................................................... 22

*Chafin v. Chafin*, 568 U.S. 165, 172 (2013) ............................................................... 22

*Covenant Media of SC, LLC v. City Of North Charleston*, 493 F.3d 421 (4th Cir. 2007) ............................................................................................................................ 23

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................................................. 6

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999)....................................... 5

*Farrar v. Hobby*, 506 U.S. 103 (1992) ....................................................................... 22

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000).................................................................................................................... 18

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ................................................................. 11

*Joshua M. v. Barr*, __ F.Supp.3d __, 2020 WL 836606 (E.D. Va. 2020) .................... 6

*McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2003)..................................................... 23

*NAACP v. Button*, 371 U.S. 415 (1963) ........................................................ 12

*National Federation of the Blind, Inc. v. Lamone*, __ F.Supp.3d __, 2020 WL 618674

(D. Md. 2020) .............................................................................................. 21

*N.Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525 (2020) ............ 22

*Porter v. Clarke*, 852 F.3d 358, 364 (4th Cir. 2017) ..................................... 19

*Sherbert v. Verner*, 374 U.S. 398 (1963) ...................................................... 13

*Stahlman v. U.S.*, 995 F.Supp.2d 446 (D. Md. 2014) .................................... 6

*Thomas v. Collins*, 323 U.S. 516 (1945) ...................................................... 13

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ............................. 15

*United States v. Laurent*, 861 F. Supp. 2d 71 (E.D.N.Y., 2011) ................ 12

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) .................... 17

*Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637 (4th Cir.

2018) ............................................................................................................ 5

*Wall v. Wade*, 741 F.3d 492 (4th Cir. 2014) .............................................. 18

**Statutes**

N.C. Gen. Stat. § 14-402 ............................................................................. 1

42 U.S.C. § 1988 ........................................................................................ 23

## INTRODUCTION

In North Carolina, unless already the holder of a valid concealed handgun permit (CHP), anyone seeking to lawfully acquire a handgun must first apply for and obtain a pistol purchase permit (PPP) through the county sheriff. N.C.G.S. §14-402(a). Defendant Sheriff Baker unilaterally short-circuited this process for all law-abiding Wake County residents eligible to obtain and who sought to obtain a PPP as their only means to lawfully acquire a handgun in the exercise of their fundamental rights under the Second Amendment to the United States Constitution. He shut everything down, blocking all new PPP applications, declaring this was necessary to avert the spread of COVID-19, all the while continuing numerous other law enforcement operations that involve similar or greater degrees of health risk.

As a result, Plaintiff Stafford was prevented from obtaining a PPP when she attempted to get one so that she could acquire a handgun in the exercise of her Second Amendment rights to defend herself and her family during these inherently dangerous times of social unrest. She sued him in this case over this action, and another Wake County resident sued him in state court, both challenging the action as unconstitutional. Under the pressure of this litigation, Defendant Baker did an about-face and agreed to resume accepting PPP applications. By that point, the damage was already done. Of equal concern, Defendant Baker continues to defend the prior action as entirely legal, seeking to avoid any liability for it through this motion to dismiss the Complaint as "moot" and failing to "state a claim for relief." At

1

the same time, the very health risks that served as the asserted justifications for the prior suspension of PPP applications still exist, and in fact are increasing all the time.

Defendant Baker cannot expect to escape responsibility for the harm already inflicted, any more than he can expect to retain the freedom to repeat the same unlawful action. The law does not contemplate such a result, and this case is the vehicle for ensuring he is both held accountable for the past harm and prevented from inflicting similar additional harm as this COVID-19 crisis continues to persist. The case must be allowed to proceed for these important purposes, which create a live controversy and which have been presented through a Complaint that more than sufficiently asserts redressable claims for relief under the Second Amendment.[1] Defendant Baker's motion to dismiss these claims must therefore be denied.

## FACTUAL AND PROCEDURAL HISTORY

On March 24, 2020, Defendant Baker announced his decision to suspend the processing of any new PPP applications (as well as CHP applications) through April 30, 2020, on the basis that this was necessary due to the health risks associated with continuing to process a high volume of such applications in the midst of the COVID-19 pandemic. Complaint – Civil Rights ("Comp.") ¶¶21-22. Plaintiff Stafford, a law-abiding Wake County resident, is and always has been eligible to obtain a PPP. *Id.* ¶12. She was considering the purchase of a handgun for the general safety of herself and her family before the pandemic, and she decided to proceed with that in the wake

---

[1] In the interest of economy and efficiency, Plaintiffs have elected to focus on their first claim for relief, specifically concerning the violation of the Second Amendment and, to that end, will permit dismissal of their second claim for relief.

of the public crisis brought about by COVID-19. *Id.* However, when Plaintiff Stafford sought to commence an application on March 26, 2020, she was prevented from doing so and thus blocked from lawfully acquiring a handgun to exercise her rights to keep and bear arms due to the bar that Defendant Baker had erected. *Id.* ¶¶25.

On March 27, 2020, Plaintiff Stafford instituted this action on behalf of herself and all similarly situated individuals who were qualified to obtain a PPP, and sought or intended to seek a PPP as the sole means for lawfully acquiring a handgun to exercise their constitutional rights to keep and bear arms, but were precluded from obtaining one during the period that Defendant Baker ceased accepting PPP applications. Comp. ¶¶5-6. Institutional Plaintiffs GRNC, SAF, and FPC have joined the action on behalf of themselves and similarly situated members and supporters whose rights and interests have been infringed by this action. *Id.* ¶¶7-12.

The same day, another individual sued Defendant Baker in state court over the same action, raising claims under state and federal law, including violation of the Second Amendment, and seeking declaratory and injunctive relief requiring resumption of PPP applications. MTD, Ex. 1. On March 31, 2020, Defendant Baker entered into a Consent Order which resolved the case. MTD, Ex. 2. According to the terms of the Consent Order, Defendant Baker agreed to "resume processing applications in as timely a fashion as possible under the current conditions." *Id.* ¶8.

Since this time, Plaintiff Stafford has obtained a PPP. Also since this time, the public health risks that Defendant Baker cited as the basis for his initial decision to suspend PPP applications are persisting and increasing at significant levels.

According to the North Carolina Department of Health and Human Services, the total number of new daily cases within the state has tripled in the last month, and the total number of new daily hospitalizations within the state has almost doubled. **https://covid19.ncdhhs.gov/dashboard**. The total number of confirmed cases in Wake County alone was 3,099 as of June 15th, *id.*, an exponential increase since March 24th when Defendant Baker first suspended the application process, at which point only 74 confirmed cases existed in the county according to Wake County Government records. **https://covid19.wakegov.com/**.

The Secretary of NCDHHS recently warned, "[i]f we need to go back to stay-at-home [orders], we will," to combat the pandemic since the state "currently has more people hospitalized for the disease than at any point since the start of the outbreak," with "38,000 confirmed cases and 1,000 deaths." **https://www.npr.org/sections/coronavirus-live-updates/2020/06/11/874568684/north-carolina-health-secretary-discusses-rise-in-covid-19-cases-in-her-state**. Additionally, Defendant Baker continues to stress on his public website the other factor he cited in justifying his previous suspension of new PPP and CHP application during this health crisis – a high volume of applications. *See* **https://wakeso.permitium.com/** (where the following message is displayed: "****We are working as fast as possible but please note demand is extremly [*sic*] high. Expect longer than normal turn around times******").

**ARGUMENT**

## I.    Standard for Dismissal.

Defendant Baker seeks a dismissal of this action pursuant to Rule 12(b)(6) of

the Rules of Civil Procedure, for failure to state a claim, as well as Rule 12(b)(1) for

lack of subject matter jurisdiction (on "mootness" grounds). MTD, p. 3. To succeed in

dismissing a civil rights complaint, the Defendant faces a high bar under each rule.

> The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, a Rule 12(b)(6) motion does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. Accordingly, a Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief. Furthermore, when as here, a Rule 12(b)(6) motion is testing the sufficiency of a civil rights complaint, we must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief *under any legal theory which might plausibly be suggested by the facts alleged*.

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir., 1999) (internal quotations and

citations omitted; emphasis in original).

Similarly, "[a] district court should grant a motion to dismiss for lack of subject

matter jurisdiction under Rule 12(b)(1) only if the material jurisdictional facts are

not in dispute and the moving party is entitled to prevail as a matter of law." *Upstate*

*Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637, 645 (4th Cir. 2018).

"[W]hen a defendant asserts that the complaint fails to allege sufficient facts to

support subject matter jurisdiction, the court must apply a standard patterned on

Rule 12(b)(6) and assume the truthfulness of the facts alleged." *Joshua M. v. Barr*, __

5

F.Supp.3d __, 2020 WL 836606 (E.D. Va. 2020), *12. "Further, 'the court may look beyond the pleadings and the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Stahlman v. U.S.*, 995 F.Supp.2d 446, 451 (D. Md. 2014) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982)).

## II.    Standard of Review.

Defendant Baker asserts that intermediate scrutiny is the appropriate standard of review, that Sheriff Baker's refusal to perform his statutory duty to accept and process PPP applications was undertaken in furtherance of an important government interest, and that the complete ban he imposed against processing PPP applications was reasonably related to that interest. All three assertions are incorrect.

### A.    *Heller's* Categorical Ban Standard Controls.

In the landmark case *D.C. v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that a categorical ban on the possession of a functional handgun in one's home, for self-defense and defense of one's family, was such an egregious violation of the Second Amendment that it could not stand under *any* standard of review. Precisely the same reasoning applies here.

Prior to March 24, 2020, Plaintiff Stafford did not own a handgun. In the face of the forced closing of businesses (putting many out of work and making at least some desperate for money), increasingly stringent restrictions on citizens' freedom of

movement, empty store shelves due to panic buying of necessities, and reports of governments releasing inmates from prisons to prevent the spread of infections, Plaintiff Stafford determined it prudent to exercise her fundamental, individual, constitutional right to keep a handgun in her home to protect herself and her family. North Carolina law prevented her from doing so without a PPP from her sheriff. [2]

Without a PPP in hand, Plaintiff Stafford could not lawfully purchase a handgun from a licensed gun dealer. She could not lawfully purchase a handgun at a gun show. She could not lawfully purchase a handgun over the Internet from another North Carolinian.[3] She could not lawfully borrow a handgun from a friend or family member. She could not lawfully accept a handgun as a gift. If a person were to die and leave Plaintiff Stafford a handgun in his or her will, she could not lawfully accept it from the estate's executor.[4] If a handgun were anonymously left on her doorstep, Plaintiff Stafford could not lawfully pick it up and carry it inside.[5] In short, because Plaintiff Stafford did not already own a handgun, Defendant Baker's refusal to issue her a PPP (for which she was qualified) absolutely precluded her from possessing or

---

[2] N.C. Gen. Stats. § 14-402(a). Plaintiff Stafford did not at the time possess a Concealed Handgun Permit.

[3] Federal law prohibits the transfer of handguns in interstate commerce to an individual without a federal firearms license.

[4] North Carolina Firearms Laws, published by the N.C. Dept. of Justice, p. 5 (2016), available at https://ncsheriffs.org/wp-content/uploads/Master-Firearms-Publication-September-2016.pdf (last visited 11 June 2020).

[5] Arguably, in this scenario it would be the giver violating NCGS § 14-402(a), but in any case the transfer would be illegal and Plaintiff Stafford would be an accomplice to it.

7

using one – anywhere (including in her home) for any reason (including self-defense or protection of her family).

In refusing to even accept the PPP application of Plaintiff Stafford and of all those similarly situated Wake County residents, and certainly in refusing to process it or issue any PPPs, Defendant Baker erected a complete and insurmountable bar against the ability of Plaintiff Stafford and all other such individuals to obtain a handgun – "the quintessential self-defense weapon" in America, *Heller*, 554 U.S. at 629 – in the lawful exercise their core Second Amendment rights. Under North Carolina law, Sheriff Baker's refusal to perform his statutory duty infringed the constitutional rights of Plaintiff Stafford and of the entire class of individuals whom she represents, just as surely and effectively as D.C.'s categorical ban on possession of a handgun, which the Court struck down in *Heller*. The *Heller* Court's reasoning applies four-square to this case: a categorical ban (effected through a refusal to perform a statutory duty) that precludes an eligible, law-abiding citizen of good moral character from legally possessing *any* handgun in her home for self-defense is a violation of her core Second Amendment right *no matter what level of judicial scrutiny is applied*. Under Supreme Court precedent, this court need not engage in any means-end analysis to issue the relief Plaintiff Stafford seeks.

**B.      Strict Scrutiny is the Only Possibly Applicable Measure of Any Tiered Scrutiny that May be Conducted.**

If the court determines that a balancing test under some form of judicial scrutiny is required, the case of *Bateman v. Perdue*, 881 F. Supp. 2d 709 (2012)

compels the application of strict scrutiny. *Bateman* invalidated N.C. statutes that banned the possession, transportation, purchase or use of any firearm *outside of one's home* during a declared state of emergency. A superficial analysis may have found that because the statutes facially burdened the Second Amendment right only *outside* the home, and not the "core" Second Amendment right of self-defense within one's home, intermediate scrutiny would be appropriate. Indeed, the *Bateman* court articulated just that reasoning:

> Therefore a law that burdens the "fundamental" or "core" Second Amendment right – a law abiding citizen's right to self-defense in the home – is subject to strict scrutiny. But, as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense. So, a law that burdens only the right to keep and bear arms outside of the home will survive constitutional challenge upon a lesser showing by the government.

*Bateman*, 881 F. Supp. 2d at 715 (internal quotations and citations omitted).

But the *Bateman* court did not stop at such a superficial analysis as to where the statutes were facially applicable. Rather, the *Bateman* court assessed the real-world impact of the statutory bans on purchase and transportation of firearms *outside* the home, and realized that they eviscerated the right to armed self-defense *inside* the home.

> Under the laws at issue here, citizens are prohibited from engaging, outside their home, in any activities secured by the Second Amendment. . . . Additionally, although the statutes do not *directly* regulate the possession of firearms within the home, they effectively prohibit law abiding citizens from purchasing and transporting to their homes firearms and ammunition needed for self-defense.

*Id.* at 714 (emphasis in original).

Because the challenged statute "prohibit[ed] law abiding citizens from purchasing and transporting to their homes firearms and ammunition needed for self-defense," *Bateman*, 881 F. Supp. 2d at 714, the court applied strict scrutiny review. Precisely the same reasoning applies here. Without a PPP from her sheriff, Plaintiff Stafford, a law abiding citizen, was "prohibit[ed] from purchasing and transporting to [her] home[] firearms and ammunition needed for self-defense." *Id*.

Defendant Baker attempts to distinguish *Bateman* by asserting that "[t]he breadth and extent of the ban on protected activity in *Bateman* is substantially broader and different from the temporary moratorium on accepting applications for pistol purchase permits proposed by Defendant Baker." MTD, p. 6. But the reasoning behind the *Bateman* court's application of strict scrutiny had nothing to do with the "breadth and extent" of the statutory bans – that reasoning focused solely on the bans' real-world impact on a law abiding citizen's right to self-defense in the home. The *Bateman* court only considered the "breadth and extent" of the statutory bans in the *subsequent* inquiry of whether they were "narrowly tailored" to advance the government's interest (and found they were not). In its reasoning behind selecting the appropriate level of judicial scrutiny, *Bateman* is directly on point here – Defendant Baker's refusal to even accept Plaintiff Stafford's PPP application absolutely prohibited her from lawfully "purchasing and transporting to [her] home[] firearms and ammunition needed for self-defense." *Id*. The action thus infringed "the 'fundamental' or 'core' Second Amendment right – a law abiding citizen's right to self-defense in the home," *id*. at 714, and should be subject to strict scrutiny review.

Defendant Baker's framing of the issue is precisely the sort of superficial analysis the *Bateman* court wisely rejected under the dictates of *Heller*. "The sole constitutional question is whether . . . [an in]ability to apply for a permit to *acquire* a handgun, as opposed to a limitation on the possession and use of a handgun for purposes of self-defense or home protection, states a facially plausible claim . . ." MTD, p. 9 (emphasis in original). Until Defendant Baker explains to this court how Plaintiff Stafford was supposed to *possess* or *use* that which she could not lawfully *acquire*, the asserted distinction is utterly frivolous. The real-world, practical impact of Defendant Baker's refusal to accept or process PPP applications was to utterly preclude Plaintiff Stafford – and all other similarly situated Wake County residents who did not at the time already own a handgun – from exercising core Second Amendment rights in lawfully defending hearth and home. *Bateman*, and the seminal *Heller-McDonald* paradigm on which it is based, compels strict scrutiny review.

Under strict scrutiny, a law or government action burdening a fundamental right is permissible only if it is "narrowly tailored to further compelling governmental interests." *Grutter v. Bollinger*, 539 U.S. 306, 331 (2003). Defendant Baker's action fails both prongs – it did not further a compelling government interest, nor was it narrowly tailored. Indeed, this is obvious because Defendant Baker's actions also fail both prongs of the more lenient standard of intermediate scrutiny under which he unsuccessfully seeks to claim refuge.

### C. Defendant Baker's Action Even Fails Intermediate Scrutiny.

"Intermediate scrutiny has been formulated in a number of ways, all requiring some form of serious government interest and a substantial connection between furthering that interest and the limit on the constitutional right." *United States v. Laurent*, 861 F. Supp. 2d 71, 98 (E.D.N.Y., 2011); *see also Bateman*, 881 F. Supp. 2d at 714 ("Intermediate scrutiny requires a 'substantial,' or 'important' government interest and a 'reasonable fit' between the regulation and the government interest).

#### 1. Important Government Interest.

In ascertaining what constitutes a serious or important government interest, the Supreme Court has employed a variety of descriptions:

- "compelling," *NAACP v. Button*, 371 U.S. 415, 438 (1963) (government interest in regulation of legal profession insufficient to sustain free speech burden by statutory ban on solicitation of clients by NAACP);

- "substantial," *Bd. of Trs. v. Fox,* 492 U.S. 469, 479 (university interest in regulating activities in dormitory insufficient to support ban on commercial speech in form of demonstration of household products in dorm room);

- "subordinating," *Bates v. Little Rock*, 361 U.S. 516, 524 (1960) (government interest in taxation insufficient to compel disclosure of NAACP membership lists in violation of their associational rights);

- "cogent," *id*.;

- "paramount," *Thomas v. Collins*, 323 U.S. 516, 530 (1945) (government police power insufficient to compel union official to obtain organizer's card prior to addressing mass meeting held to organize a union); and

- "strong," *Sherbert v. Verner*, 374 U.S. 398, 408 (1963) (government interest in providing a uniform day off sufficient to support burden on religion rights in mandating Sunday closing).

While these characterizations consistently imply a high bar for the *importance* of an asserted government interest, they are also consistent in the required *nature* of the interest asserted – specifically, that it is a uniquely *governmental* interest.

Defendant Baker has asserted the following as important government interests supporting his refusal to accept PPP applications: maintaining social distancing in long lines of PPP applicants, MTD, pp. 6-7; keeping PPP applicants from congregating in numbers greater than 50, *id.* at p. 7; and the health and welfare of Sheriff's Office personnel and jail inmates, *id.* at p. 8. While these interests are important, only the last potentially implicates the Sheriff's Office as a government entity or any official governmental action, as opposed to implicating routine interests shared by every employer and every business open to the public.

Every employer – from Walmart, to the undersigned attorney's law firm, to the Wake County Sheriff's Office – has an obligation to provide a safe and healthy environment for its employees. This is a routine, common – indeed, universal – obligation and concern. There is nothing inherent in the nature of the Sheriff's Office *as a governmental entity* that imposes any greater obligation, or raises any greater

interest, in employee health and safety than any private business or other government office. During the pandemic and related states of emergency and stay-home orders, *every* business has a heightened interest in employee health. *Every* business continuing operations has taken steps to address it – from issuing masks and gloves, to increasing sanitation of the workplace, to regulating employees' contact with the public, to facilitating working remotely. While some Sheriff's Deputies' duties may have placed them at increased risk, such as physically intervening in altercations or arresting people, the purely administrative task of accepting PPP applications from the public are not among them. The health risks to Sheriff's Office personnel in accepting PPP applications are not substantially different, or more dangerous, than store checkout clerks or other employees face in having contact with the public, and indeed are significantly less dangerous than the risks facing, *e.g.,* health care workers.

Similarly, during the pandemic and restrictions, *every* business open to the public has taken steps to comply with congregation limits and to impose social distancing. Stores have reduced capacity by limiting the number of shoppers allowed in at any one time, by placing social distancing markers on the floors, and the like. Indeed, everyone in Wake County was subject to the emergency restrictions limiting gatherings to fewer than 50 persons when Defendant Baker suspended all new PPP and CHP applications. His obligation to comply with these restrictions is not and has never been a uniquely *governmental* interest, of the nature to justify actions like his that have infringed individual constitutional rights.

Of all Defendant Baker's assertions of an important government interest, only the safety of jail inmates could be considered uniquely governmental in nature, and then only in theory. However, in articulating the actual basis of the concern, Defendant Baker does not rely on a uniquely *governmental* interest, such as *incarceration per se*. Instead, he merely cites a concern of spreading infection among a contained population. Such a concern has been shared, and appropriately addressed, by every hospital, shelter, elderly living facility, assisted living facility, and skilled nursing facility in the county – and *without* shutting down their operations for any length of time.

## 2. Fit Between the Asserted Interest and the Burden on Second Amendment Rights.

For government burdens on Second Amendment rights analyzed under the intermediate scrutiny standard,

> the government must demonstrate . . . that there is a 'reasonable fit' between the challenged regulation and a 'substantial' government objective. Although the various forms of intermediate scrutiny differ in precise terminology, they essentially share the same substantive requirements. They all require the asserted governmental end to be more than just legitimate, either 'significant,' 'substantial,' or 'important' . . . and require the fit between the challenged regulation and the asserted objective be reasonable, not perfect. Significantly, *intermediate scrutiny places the burden of establishing the required fit squarely upon the government.*

*United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (emphasis added).

Defendant Baker declares it is "well within the bounds of reason and common sense" to conclude that his flat refusal to accept or process *any* PPP application was a "reasonable fit" to the asserted interests of employee and inmate health and social

distancing. MTD, p. 11. Yet he has utterly failed to support the contention. He has cited no evidence that halting PPP applications – but not other functions of the Sheriff's Office – would have had any significant effect on the spread of COVID-19 or that the rate of infection would have been any greater had the application process continued with the use of the same safety protocols all other businesses have employed in continuing their operations. Defendant Baker did not announce a moratorium on law enforcement activity such as patrolling, performing traffic control, investigating accidents, transporting prisoners, or conducting criminal investigations. His office did not stop performing court duties such as providing bailiffs, managing juries, serving subpoenas, summonses, warrants, writs, or civil process, executing foreclosures, or serving eviction orders. Out of all the myriad functions of the Sheriff's Office – many of which necessarily involve greater risks than accepting PPP applications from the public (which can be done online) – the *only* action he chose to completely terminate is one that is a legal prerequisite to obtain a handgun in North Carolina.

As stated above, the same health and safety concerns advanced by Defendant Baker as substantial governmental interests were adequately addressed by *every* employer, *every* business open to the public, and *every* living facility, without simply abdicating duties that had the direct result of working a complete ban on the constitutional rights of a significant segment of the county's residents.

"[I]ntermediate scrutiny does not require that a regulation be the least intrusive means of achieving the relevant government objective," *United States v.*

*Masciandaro*, 638 F.3d 458, 474, but where thousands of employers and businesses across the county addressed the asserted interest without completely abandoning a vital service, Defendant Baker's refusal to accept PPP applications cannot fairly be characterized as a "reasonable fit" – particularly where subsequent development has proven that *he can and is* accept(ing) the applications in a safe manner without *unnecessarily* blocking law-abiding citizens from obtaining handguns in the exercise of their fundamental Second Amendment rights.

Defendant Baker has failed to meet *either* prong of the intermediate scrutiny test. The interests asserted as important *governmental* interests have no particular nexus to the Sheriff's role as a government actor – while certainly important, Defendant Baker's asserted interests in employee and inmate health, and enforcing social distancing among applicants, are routine concerns shared and adequately addressed by thousands of employers, both business and government offices. Defendant Baker has provided no evidence or analysis indicating that a complete ban on only *one* of the Sheriff's Office's myriad activities – pointedly, *not* the one presenting the highest risk of the infection he allegedly claimed to dread – constitutes a "reasonable fit" to the commonly shared pandemic concerns. Failure of *either* prong means his actions fail to pass constitutional muster, and Plaintiff Stafford is entitled to the relief she seeks under any form of scrutiny.

## III. A Live Justiciable Case Remains with Fully Redressable Claims.

This case arose when Defendant Baker unilaterally announced his office would not accept or process any new PPP applications, thus erecting an absolute bar to the

acquisition of a handgun by anyone without a CHP. In response to the state court action challenging the same conduct, Defendant Baker established a process by which Wake County residents may again submit PPP applications – for now at least. Plaintiff Stafford ultimately received a PPP from Defendant Baker through this new process. However, this does not render this case moot.

### A.    Defendant Baker Cannot Carry His "Heavy Burden" of Proving Mootness Under the Voluntary Cessation Doctrine

"It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.' … '[I]f it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.'" *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citations omitted); *accord Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014). Therefore, "[v]oluntary cessation of challenged conduct moots a case … only if it is *absolutely* clear that the allegedly wrongful behavior could not reasonably be expected to recur. And the heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again *lies with the party asserting mootness.*" *Adarand Constructors v. Slater*, 528 U.S. 216, 222 (2000) (internal quotations omitted); *accord Porter v. Clarke*, 852 F.3d 358, 364 (4th Cir. 2017) (a defendant bears a "formidable burden" here).

Defendant Baker has not even averred that he will not simply repeat his act of refusing to accept PPP applications whenever it becomes burdensome, much less borne the "heavy burden" of proving that to this court. Indeed, the same essential

risks he cited as the basis for previously suspending all such applications are still present: the health risks of COVID-19 are not only still prevalent but significantly increasing all the time, with the rate of new COVID-19 infections, hospitalizations, and deaths steadily on the rise throughout the state and the nation, and the volume of PPP applications remains "extrem[e]ly high" according to the sheriff's own website. And he continues to emphasize these same justifications in defending the legality of the prior action, as if they necessarily excuse any suspension of PPP applications in response to COVID-19. *See e.g.*, MTD, p. 9 (arguing the prior suspension was necessary in light of the "large numbers of applicants" because "[w]ithout treatment protocols or available immunization, the only known defense to the spread of the pandemic was to prevent social interaction and contact as much as possible").

Notably, the terms of the Consent for which Defendant Baker successfully bargained in resolving the state court lawsuit characterized these reasons as having *justified* his action. MTD, Ex. 2, § 6 (characterizing Defendant Baker's action as being "due to his efforts to comply with Proclamation of Emergency Restrictions and his paramount and legitimate concern for the public health and safety in light of the existing declared states of emergency due to the COVID-19 pandemic outbreak being specifically concerned for the health and welfare of the citizens of Wake County, the Wake County Sheriff's Office personnel and jail residents housed in the Wake County Public Safety Center, the same location where said applications are accepted and processed.") While this message may pan well for the sheriff publicly, *legally* it is clear his action was not justified for all the reasons already discussed.

Defendant Baker mischaracterizes these terms of the Consent Order as "judicial findings" independently "found" by the state court. MTD, p. 7. As the preamble to the order makes clear in stating that "the Court finds that *the parties have agreed* to the following" terms, for purposes of "memorializ[ing] this agreement," Ex. 2, p. 1, the order represents merely a recitation of terms that the parties themselves established in negotiating a mutually acceptable resolution, not a judicial declaration to this effect. It was in accordance with the terms of this negotiated agreement that Defendant Baker was to "resume accepting and processing" PPP applications. *Id.* And the terms do not preclude him from refusing such applications in the future. *Id.* at § 8 (Defendant Baker has merely "agreed . . . to resume processing applications in as timely a fashion as possible under the current conditions.").

To the extent the order might be construed as representing "judicial findings" to this effect, such that the state court *found* Defendant Baker's action was justified based on his proffered reasons, that would imply the court is actually amenable to permitting such suspensions of this nature despite their unconstitutionality. And, because the court has retained jurisdiction over the matter, MTD, Ex. 2, § 10, Defendant Baker retains the ability to request modification of the Consent Order permitting a further suspension of PPP applications based on *increasing* degree of the same risks that the court "found" legitimized the last suspension.

Either way, the terms of the Consent Order do not satisfy the narrow exception to voluntary cessation doctrine as an "'unconditional and irrevocable' agreement that prohibits [Defendant Baker] from returning to the challenged conduct." *Porter*, 852

F.3d at 364 ("The Supreme Court has held that a defendant satisfies this heavy burden when, for example, it enters into an 'unconditional and irrevocable' agreement that prohibits it from returning to the challenged conduct."). Again, "[t]he standard for determining whether a defendant's voluntary conduct has mooted a case is 'stringent,'" *National Federation of the Blind, Inc. v. Lamone*, __ F.Supp.3d __, 2020 WL 618674 (D. Md. 2020), *5, and Defendant Baker simply cannot carry this "heavy burden" with the Consent Order because the circumstances do not show the unconstitutional action of suspending PPP applications "could not reasonably be expected to recur" – especially while we are still in the midst of the very same crisis that spurred the sheriff's prior suspension which he continues to staunchly defend.

**B.      This Court Still Has the Power to Grant Meaningful and Effective Relief on Plaintiff's Claims**

"Fundamentally, a case becomes moot *only* when it is *impossible* for a court to grant any effectual relief *whatever* to the prevailing party. As long as the parties have a concrete interest, *however small*, in the outcome of the litigation, *the case is not moot*." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (internal quotations and citations omitted; emphasis added).

Plaintiff Stafford filed this action seeking a declaratory judgment that Defendant Baker's practice of failing or refusing to accept or process new PPP applications violated her constitutional rights. Comp., p. 17. She also sought a permanent injunction prohibiting Defendant Baker and his office from continuing to refuse to accept or process PPP applications. *Id*. Plaintiff Stafford further sought

nominal damages, *id*. at 18, attorneys' fees, *id*. at 19, and "[a]ny and all other and further relief . . . as the Court otherwise deems just and equitable," *id*. at 18. This court is capable of granting *all* these forms of relief and they would both redress the harm already inflicted and protect against the future harm reasonably expected to recur without a permanent injunction.

In fact, the prospect of nominal damages alone precludes this case from being moot. "Doubtless 'the basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights.'" *Farrar v. Hobby*, 506 U.S. 103, 112-13 (1992) (quoting *Carey v. Piphus*, 435 U.S. 247, 254 (1978). "*Carey* obligates a court to award nominal damages when a plaintiff establishes the violation of his right to procedural due process but cannot prove actual injury." *Farrar* at 112. "And they are particularly important in vindicating constitutional interests." *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1535-36 (2020) (J. Alito, dissenting). "Consequently, courts routinely award nominal damages for constitutional violations. And it is widely recognized that a claim for nominal damages precludes mootness." *Id*. at 1536; *see e.g., Covenant Media Of SC, LLC v. City of North Charleston*, 493 F.3d 421, 429, fn. 4 (4th Cir. 2007) ("In addition to injunctive relief, Covenant sought compensatory and nominal damages from the City's enforcement of the allegedly unconstitutional former Sign Regulation. Covenant's suit is not moot because if Covenant is correct on the merits, it is entitled to at least nominal damages."). "This is especially true when, as here, the defendant maintains the legality of the challenged practice despite their voluntary

abandonment of a course of conduct." *Brown v. Transurban USA, Inc.*, 144 F.Supp.3d 809, 828 (E.D. Va. 2015).

Moreover, a party awarded nominal damages for constitutional injury is deemed to be a "prevailing party" entitled to recover attorney's fees pursuant to 42 U.S.C. § 1988. *Farrar*, 506 U.S. at 112 ("We therefore hold that a plaintiff who wins nominal damages is a prevailing party under § 1988."); *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2003) ("For purposes of § 1988, 'a party in whose favor a judgment is rendered, regardless of the amount of damages awarded,' is the prevailing party.") Such fee awards further the important policy goal of encouraging litigation of civil rights claims.

> [C]ivil rights statutes vindicate public policies of the highest priority, yet depend heavily on private enforcement. Persons who bring meritorious civil rights claims, in this light, serve as private attorneys general. Such suitors, Congress recognized, often cannot afford legal counsel. They therefore experience severe hardship under the "American Rule." Congress enacted § 1988 to ensure that nonaffluent plaintiffs would have effective access to the Nation's courts to enforce civil rights laws.

*Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 635-36 (2001) (J. Ginsberg, dissenting) (internal quotations and citations omitted).

For all these reasons, a live justiciable case remains with fully redressable claims, such that Defendant Baker's claim of mootness necessarily fails.

## CONCLUSION

For the foregoing reasons, the Court should DENY Defendant Baker's Motion to Dismiss because a live justiciable controversy remains over Plaintiff's claims,

which easily satisfies the lenient test of legal sufficiency, and it should issue declaratory judgment that Plaintiff Stafford's Second Amendment rights have been infringed, issue a permanent injunction requiring Defendant Baker to perform his statutory duty to accept and process PPP applications, and award nominal damages and attorney fees.

Respectfully Submitted,

/s/ Edward H. Green, III
Edward H. Green, III, Esq.
Coats & Bennett, PLLC
1400 Crescent Green
Suite 300
Cary, NC 27518
P: 919-854-1844
E: egreen3@coatsandbennett.com

/s/ Raymond M. DiGuiseppe
Raymond M. DiGuiseppe, Esq.
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

/s/ Adam Kraut
Adam Kraut, Esq.
Firearms Policy Coalition
1215 K Street
17th Floor
Sacramento, CA 95814
P: (916) 476-2342
E: akraut@fpclaw.org

## Certificate of Compliance

I certify that the foregoing memorandum was prepared with the Microsoft Word processing program in 12-point Century School font and contains 6,178 words, according to the program's word count, and thus complies with the word limitation of 8,400 words.

/s/ Edward H. Green, III
Edward H. Green, III, Esq.
