IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CV-123-FL

| | |
|---|---|
| KELLY STAFFORD; GRASS ROOTS NORTH CAROLINA; SECOND AMENDMENT FOUNDATION; and FIREARMS POLICY COALITION, INC, )<br><br>Plaintiffs, )<br><br>v. )<br><br>GERALD BAKER in his official capacity as Sheriff of Wake County, )<br><br>Defendant. ) | ORDER |

This matter is before the court on defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (DE 16). Plaintiffs have responded in opposition, and the issues raised are ripe for ruling. For the following reasons, defendant's motion is granted in part and denied in part, as set forth herein.

**STATEMENT OF THE CASE**

Plaintiffs commenced this action on March 27, 2020, asserting claims against defendant, sheriff of Wake County, North Carolina, arising out of defendant's announcement of a suspension in acceptance of new applications for pistol purchase permits (PPP) and concealed handgun permits (CHP), from March 24, 2020, through April 30, 2020. Plaintiffs assert claims for 1) violation of their rights under the Second and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983 ("first claim"); and 2) violation of state statutory rights ("second claim"). Plaintiffs seek nominal damages for violation of their constitutional rights;

declaratory judgment; injunctive relief; attorney's fees; and any and all other and further relief as may be necessary, appropriate, just, and equitable.

Defendant filed the instant motion to dismiss on April 28, 2020, on the basis that the complaint fails to state a claim upon which relief can be granted, and on the basis that plaintiffs' claims are moot. Defendant relies upon state court filings, comprising an amended complaint and consent order in the case Groo v. Wake County Sheriff's Office et al., No. 20 CVS 4400 (Sup. Ct. Wake Co.). Plaintiff responded in opposition on June 18, 2020, and, although the court allowed an extension of time to file a reply on or before July 16, 2020, defendant did not file a reply.

## STATEMENT OF THE FACTS

The facts alleged in the complaint may be summarized as follows. Plaintiff Kelly Stafford ("individual plaintiff") is a citizen and resident of Wake County, North Carolina. She is a member and supporter of plaintiff Grass Roots, North Carolina (GRNC), which is a non-profit organization "dedicated to the protection and advancement of constitutional and civil liberties," with over 20,000 paid and affiliate members. (Compl. ¶ 7). Plaintiff Second Amendment Foundation (SAF) is a nonprofit educational foundation that "seeks to preserve the effectiveness of the Second Amendment through education, research, publishing, and legal action programs focused on the constitutional rights to possess firearms," with over 650,000 members and supporters. (Id. ¶ 8). Plaintiff Firearms Policy Coalition, Inc. (FPC, together with SAF and GRNC, the "organizational plaintiffs"), is a nonprofit organization that provides "direct and grassroots advocacy, legal efforts, and education aimed at defending the fundamental rights, privileges, and immunities guaranteed by the United States Constitution and embedded into the fabric of this nation through its deeply rooted histories and traditions, especially the fundamental right to keep and bear arms enshrined in the Second Amendment." (Id. ¶ 9).

Defendant is the elected Sheriff of Wake County, responsible for overseeing and exercising law enforcement authority throughout the county, including the acceptance and processing of pistol purchase permits ("PPP") and concealed handgun permits ("CHP") in accordance with the statutory process established under N.C. Gen. Stat. §§ 14-402 et seq. and 14-415.12 et seq. for all county sheriffs in the State.[1]

On March 10, 2020, North Carolina Governor Roy Cooper declared a statewide state of emergency in response to the spread of novel coronavirus infections, and the associated disease COVID-19.

On March 24, 2020, defendant announced a temporary suspension in the acceptance and processing of PPP applications, through April 30, 2020, citing as the basis for this action, according to the complaint, "a significant increase in PPP applicants and concomitant concerns over social distancing violation by long lines of applicants." (Id. ¶ 21). A news article quoted defendant stating, at the time, "[t]his decision does not limit anyone's right to purchase a handgun" and "[t]his decision is not a violation of anyone's Second Amendment Rights." (Id.).

The following day, on March 25, 2020, the following notice was prominently displayed on the public website defendant maintains for the Wake County Sheriff's Office:

> Due to public health concerns related to the COVID-19 pandemic; [sic] the Wake County Sheriff's Office will temporarily postpone accepting new applications for pistol purchase permits and new concealed carry permits until April 30[], 2020. Applications received prior to March 25, 2020 and a have [sic] <u>already</u> signed a mental health waiver will continued [sic] to be processed. Those applicants who have not already signed a mental health waiver will not be processed.

---

[1] By way of summary, to provide context to the statement of facts, § 14-402(a) requires a license or permit from the county sheriff before a person may purchase or receive a pistol; § 14-403 requires a sheriff to issue a permit to an applicant after determining that statutory criteria have been met by the applicant; and § 14-404 requires a sheriff to act upon an application within 14 days of the date of application. Section § 14-415.15 sets similar criteria for issuance of a CHP, with a 45 day period of time for acting upon an application.

(Id. ¶ 22 (emphasis in original)). The next day, March 26, 2020, the notice was amended to create an exception for those with existing CHPs set to expire before April 30, 2020, providing that they could still apply during this period of time, but it continued to otherwise declare that no new applications for PPPs or CHPs would be accepted.

According to the complaint, individual "[p]laintiff is a law-abiding citizen and resident of Wake County, who is of good moral character, is not prohibited under any state or federal law from the purchase, receipt, transfer, possession, or other use of a firearm, and is in all other respects statutorily eligible to apply for and obtain a PPP." (Id. ¶ 23). She "has been actively considering the purchase of a handgun for some time." (Id.). "In the wake of the recent public health crisis and the associated psychological and economic pressures increasing the potential of societal dangers as people face a scarcity of resources, she has become more concerned for the personal safety of herself and her family." (Id.). "This prompted [her] to accelerate her purchase of a handgun to ensure she has it available during these times for self-defense and defense of her family in her home." (Id.).

On March 26, 2020, individual "plaintiff telephoned the Wake County Sheriff's office to inquire about proceeding with an application for a PPP, but she was informed that the office was not accepting PPP applications until after April 30, [2020], consistent with the public notice on the website declaring the entire application process suspended." (Id. ¶ 24). Without a PPP issued by defendant, she was statutorily barred from purchasing any handgun for defense of herself and her family in her home. Organizational plaintiffs have received inquiries from members wishing to obtain PPPs. According to the complaint, many "expressed outrage that the processing of PPP applications [was] being suspended concomitant with the imposition of increasingly stringent regulations limiting the free movement and activities of people." (Id. ¶ 26).

4

**COURT'S DISCUSSION**

A.  Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (quotations omitted).

B.  Analysis

    1.  Section 1983 Claim for Damages

Defendant argues that plaintiffs fail to state a claim for violation of the Second Amendment, because the alleged temporary delay in accepting permits survives an intermediate scrutiny level of review.[2] Plaintiffs contend a heightened level of scrutiny applies, and that they have alleged in any event a violation of the Second Amendment at the level of intermediate scrutiny.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S.

---

[2] Defendant also seeks dismissal of plaintiffs' second claim for violation of North Carolina law. Plaintiffs expressly abandon this claim in response to defendant's motion. (Pl's Mem. (DE 21) at 6 n. 1). Therefore, defendants' motion to dismiss is granted in this part and plaintiffs' second claim is dismissed without prejudice.

Const. Amend. II. In District of Columbia v. Heller, 554 U.S. 570, 595 (2008), the Supreme Court recognized the Second Amendment confers an individual, as opposed to a collective, right to keep and bear arms. In Heller the Supreme Court held unconstitutional District of Columbia laws making it a crime to carry an unregistered firearm, prohibiting the registration of handguns, and prohibiting rendering any firearm operable for the purpose of immediate self-defense. See id. at 635.

In so holding, the Supreme Court reasoned: "The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose" of self-defense. Id. at 628. "The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute." Id. "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to 'keep' and use for protection of one's home and family, would fail constitutional muster." Id. at 628-629 (quotations omitted). The Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Id. at 635.

The Supreme Court left open for future consideration constitutionality of regulations on firearm use and possession short of an outright ban on handguns in the home. The court observed that the Second Amendment right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id. at 626. The court noted that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the

6

commercial sale of arms." Id. at 626-627. The court identified "these presumptively lawful regulatory measures only as examples," not purporting to be exhaustive. Id. at 627 n. 26.

In McDonald v. City of Chicago, 561 U.S. 742 (2010), the Supreme Court applied the Second Amendment to the states by virtue of the Fourteenth Amendment, recognizing that it "limits (but by no means eliminates) their ability to devise solutions to social problems that suit local needs and values." Id. at 785. "State and local experimentation with reasonable firearms regulations will continue under the Second Amendment." Id.

The United States Court of Appeals for the Fourth Circuit applies a "two-part approach to Second Amendment claims . . . under Heller." Kolbe v. Hogan, 849 F.3d 114, 132 (4th Cir. 2017) (en banc). "Pursuant to that two-part approach, we first ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." Id. at 133. If so, "we next apply an appropriate form of means-end scrutiny," "between strict scrutiny and intermediate scrutiny." Id. (quotations omitted). The court is "not obliged to impart a definitive ruling at the first step of the . . . inquiry," and courts have sometimes "deemed it prudent to instead resolve post-Heller challenges to firearm prohibitions at the second step." Woollard v. Gallagher, 712 F.3d 865, 875 (4th Cir. 2013). Here, where defendant does not dispute application of the first step (see Def's Mem. (DE 17) at 5), the court proceeds to determination of appropriate level of scrutiny.

"[T]he level of scrutiny we apply depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." Kolbe, 849 F.3d at 133. Regarding the determination of level of scrutiny, the Fourth Circuit has recognized: "The Second Amendment is no more susceptible to a one-size-fits-all standard of review than any other constitutional right." United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir. 2011) (quotations omitted). "Gun-

7

control regulations impose varying degrees of burden on Second Amendment rights, and individual assertions of the right will come in many forms." Id.

In Masciandaro, the court "assume[d] that any law that would burden the fundamental, core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." Id. "But, as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." Id. Thus, "less severe burdens on the right, laws that merely regulate rather than restrict, and laws that do not implicate the central self-defense concern of the Second Amendment, may be more easily justified." Id. (quotations omitted); United States v. Hosford, 843 F.3d 161, 168 (4th Cir. 2016) (quoting same rule, and applying intermediate scrutiny to a law that "serves, not as a prohibition, but as a condition or qualification" on sale of firearms).

The level of scrutiny guides the court's analysis of a Second Amendment claim. "To satisfy strict scrutiny, the government must prove that the challenged law is narrowly tailored to achieve a compelling governmental interest." Kolbe, 849 F.3d at 133. "Strict scrutiny is thereby the most demanding test known to constitutional law." Id. "The less onerous standard of intermediate scrutiny requires the government to show that the challenged law is reasonably adapted to a substantial governmental interest." Id. (quotations omitted). "The government must demonstrate under the intermediate scrutiny standard that there is a reasonable fit between the challenged regulation and a substantial governmental objective." Id. (quotations omitted). "Intermediate scrutiny does not demand that the challenged law be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question." Id. (quotations omitted). "In other words, there must be a fit that is reasonable, not perfect." Id. (quotations omitted). By contrast, the lowest "rational-basis" standard of scrutiny

requires only a "rational relationship" to a "legitimate governmental purpose." Heller v. Doe, 509 U.S. 312, 320 (1993).

In this case, defendant's challenged suspension of accepting applications presents some characteristics implicating, to a degree, both strict scrutiny and intermediate scrutiny. On the one hand, the suspension, which relates to permits for pistols and concealed handguns, directly implicates the "class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose" of self-defense, comprising "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family." Heller, 554 U.S. at 628-629. Without ability to apply for a permit during the challenged suspension, plaintiff had absolutely no lawful means to possess a pistol for use in her home during this time. On the other hand, the suspension is not an outright ban on handgun use in the home, as in Heller. It is not a permanent and insurmountable hurdle, nor a "prohibition" on the use of handguns in the home, but rather "a condition or qualification." Hosford, 843 F.3d at 168. It "regulate[s] rather than restrict[s]" the ability to obtain a handgun for use in the home. Masciandaro, 638 F.3d at 470 (quotations omitted). In this respect, the challenged suspension may fall in the category of "laws imposing conditions and qualifications" on the sale of handguns, recognized in Heller, which may be "presumptively lawful regulatory measures." 554 U.S. at 627 n. 26.

In sum, while the instant suspension plainly burdens plaintiffs' Second Amendment rights, the "degree to which the challenged [action] burdens the right," Kolbe, 849 F.3d at 133, is not a high degree of burden but rather a low degree of burden, because it is temporary and arises in the context of a statutory scheme that already requires an applicant to wait up to 14 days before receiving an application approval. See N.C. Gen. Stat. § 14-404(f); cf. Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 207 (5th Cir. 2012)

9


(applying intermediate scrutiny to laws that "regulate commercial sales through an age qualification with temporary effect," preventing law-abiding adults aged 18 to 20 from purchasing handguns from federally licensed dealers); Silvester v. Harris, 843 F.3d 816, 818-819 (9th Cir. 2016) (applying intermediate scrutiny to "law establishing a 10-day waiting period for all lawful purchases of guns"). Therefore, while there is not Fourth Circuit case law directly on point, it appears that an intermediate level of scrutiny is appropriate.

Plaintiffs nonetheless cite to this court's decision in Bateman v. Perdue, 881 F. Supp. 2d 709 (E.D.N.C. 2012) as a basis for applying strict scrutiny in this case. In Bateman, the court determined that strict scrutiny applied to statutes that prohibit, during a declared state of emergency, "the transportation or possession of both 'deadly weapons' and ammunition off one's own premises" as well as additional statutes that "authorize even more intrusive measures," described by the court as follows:

> This prohibition applies equally to all individuals and to all classes of firearms, not just handguns. It is not limited to a certain manner of carrying weapons or to particular times of the day. Most significantly, it prohibits law abiding citizens from purchasing and transporting to their homes firearms and ammunition needed for self-defense.
>
> . . . . Acting pursuant to these [additional] statutes, government officials may outright ban the possession, transportation, sale, purchase, storage or use of dangerous firearms and ammunition during a declared state of emergency—even within one's home where the need for defense of self, family, and property is most acute.
>
> While the bans imposed pursuant to these statutes may be limited in duration, it cannot be overlooked that the statutes strip peaceable, law abiding citizens of the right to arm themselves in defense of hearth and home, striking at the very core of the Second Amendment.

Id. at 715-716.

The statutes in Bateman are distinguishable from the suspension in the instant case because they apply to every declaration of emergency, whereas the instant suspension is a single event.

10

Moreover, the statutes in Bateman allow officials to "outright ban the possession, transportation, sale, purchase, storage or use" of firearms, id. at 715, whereas the instant suspension only relates to the purchase of a handgun by someone who does not already have a permit to do so. At the same time, the court recognizes that the instant suspension is more focused on handguns and their acquisition than the statutes at issue in Bateman.

In this case, the court need not resolve definitively at this juncture the level of scrutiny that applies, because plaintiffs state a claim for violation of their Second Amendment rights under an intermediate level of scrutiny. Plaintiffs plausibly have alleged, viewing the facts in the complaint in the light most favorable to them, that the challenged suspension is not "reasonably adapted to a substantial government interest." Kolbe, 849 F.3d at 133. Here, defendant cited as a basis for the suspension "a significant increase in PPP applicants and concomitant concerns over social distancing violation by long lines of applicants." (Compl. ¶ 21). Defendant further explained that the suspension was "[d]ue to public health concerns related to the COVID-19 pandemic." (Id. ¶ 22; see Compl. Ex 2. (DE 8-3 at 2)). The complaint attaches a news report in which defendant is quoted stating "Over the past several weeks, our staff has been inundated with high volumes of permit applications that has made it impossible to process by law," and "this action will limit persons encountering one another during this time of State of Emergency." (Compl. Ex 1. (DE 8-2 at 2)).

As alleged, there is not a "reasonable fit between the challenged regulation and a substantial governmental objective." Kolbe, 849 F.3d at 133. Here, a complete suspension in accepting PPP applications does not reasonably fit with the government objective to ameliorate "concerns over social distancing" and "concerns related to the COVID-19 pandemic." (Compl. ¶ 22). Nor does a complete suspension in accepting PPP applications reasonably fit a problem of high volumes of

11

Case 5:20-cv-00123-FL   Document 26   Filed 02/18/21   Page 11 of 17

permit applications. (Compl. Ex 1. (DE 8-2 at 2)).[3] Rather, the corrective measure chosen under the facts alleged is at best a blunt, or tangentially related, measure for addressing the concerns noted. Indeed, based on the allegations in the complaint, it is plausible to infer that defendant suspended acceptance of applications due to inability to process a high volume of applicants at a time of acute public need, under the guise of generally articulated "public health concerns." (Id. ¶ 22; see Compl. Ex 2. (DE 8-3 at 2)). While the court recognizes that the challenged action need not "be the least intrusive" means of achieving the government objective, Kolbe, 849 F.3d at 133, here there are numerous less intrusive alternatives, plausibly inferred, that reasonably could have fit the stated public health objectives without suspending acceptance of all applications.

Defendant argues that other facts pertinent to the court's intermediate scrutiny review are contained in the public record of the Wake County Superior Court and are appropriate for this court's consideration by judicial notice. Nevertheless, while the court may take judicial notice of the fact of the filing of particular documents in the Wake County Superior Court, the court does not accept as true statements or findings made in such documents for Rule 12(b)(6) purposes. When considering documents "prepared by or for the defendant," the court must take into account that such documents may "reflect the defendant's version of contested events or contain self-serving, exculpatory statements that are unlikely to have been adopted by the plaintiff." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 168 (4th Cir. 2016). Here, for example, defendant cites a consent order entered in Wake County Superior Court in which the court makes findings of fact that "from March 10, 2020 to March 24, 2020, . . . [defendant] received applications in numbers greater than the County's limit on gatherings exceeding 50 persons." (Def's Mem. (DE 17) at 7).

---

[3] As a separate matter, defendant's suspension of acceptance of all new concealed handgun permit appointments, while allowing renewal appointments to continue, also lacks a reasonable fit to the government concerns articulated. (Compl. Ex 3. (DE 8-4 at 2)).

12

Defendant cites a finding by the court that defendant's actions were "due to his efforts to comply with the declared states of emergency and out of concern for the health and welfare of Wake County citizens, Sheriff's Office personnel and <u>jail inmates housed in proximity to the application processing location</u>." (Id.) (emphasis added). Further, defendant notes that the consent order required defendant to resume accepting PPP applications on or before April 7, 2020, meaning the moratorium extended only 13 calendar days. (Id. at 8).

None of these facts are alleged in the complaint, and they are not properly taken into account at this juncture in determining whether plaintiffs stated a plausible claim for violation of the Second Amendment. While defendant may be able to point to facts at a different juncture in the case to establish as a matter of law a reasonable fit between a complete suspension in accepting applications and public health concerns, such facts are not alleged in the complaint. Further, such facts may be pertinent to a determination of mootness for purposes of plaintiffs' claim for injunctive relief, addressed in the next section of this order. But, for purposes of plaintiff's claim for nominal damages, plaintiff has stated a claim upon which relief can be granted. Therefore, defendant's motion to dismiss must be denied in this part.

2. Claim for Injunctive Relief

Plaintiffs seek in the complaint an injunction against defendant "prohibiting the current practices of failing or refusing to accept or process new PPP applications, with such directions and orders as are necessary to effectively compel the immediate resumption of accepting and processing PPP applications in accordance with the procedures established under N.C.G.S. § 14-402 et seq." (Compl. (DE 8) at 17). For the following reasons, plaintiffs' claim for injunctive relief must be dismissed without prejudice for mootness and lack of jurisdiction.

"The doctrine of mootness constitutes a part of the constitutional limits of federal court jurisdiction, which extends only to actual cases or controversies." Porter v. Clarke, 852 F.3d 358, 363 (4th Cir. 2017). "Mootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997). "A claim is moot when the parties lack a legally cognizable interest in the outcome." SAS Inst., Inc. v. World Programming Ltd., 874 F.3d 370, 389 (4th Cir. 2017) (quotations omitted).

In the context of a claim for injunctive relief, federal courts should aim to ensure "the framing of relief no broader than required by the precise facts." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 193 (2000). Accordingly, a claim for injunctive relief is moot "when there is no effective relief available in federal court that the plaintiff has not already received." SAS Inst., Inc., 874 F.3d at 389 (quotations omitted) (emphasis added); see, e.g., Univ. of Texas v. Camenisch, 451 U.S. 390, 398 (1981) ("[T]he question whether [an] . . . injunction should have been issued here is moot, because the terms of the injunction . . . have been fully and irrevocably carried out."); Clay v. Miller, 626 F.2d 345, 347 (4th Cir. 1980) ("Plaintiff Clay's prayer for injunctive relief is moot because he has served his sentence and was released."); Banks v. Multi-Family Mgmt., Inc., 554 F.2d 127, 128–29 (4th Cir. 1977) ("When the landlord consented to an injunction against it, plaintiff was no longer injured in fact; she would not benefit in any tangible way from any further court intervention with regard to the Secretary; and she was no longer an adequate representative of the class.").

Here, plaintiffs' claim for injunctive relief is moot for several reasons. First, individual plaintiff Stafford has, since April 7, 2020, been able to apply for a PPP, pursuant the terms of

14

the March 31, 2020, Wake County Superior Court consent order. (See Def's Mem., Ex. 1 (DE 17-2) at 3; Pl's Mem. (DE 21) at 22).[4] Thus, the relief sought in plaintiffs' claim for injunctive relief, "prohibiting the current practices of failing or refusing to accept or process new PPP applications, . . . [and] compel[ing] the immediate resumption of accepting and processing PPP applications," (Compl. (DE 8)), has already been obtained, rendering the claim moot. See SAS Inst., Inc., 874 F.3d at 389; see, e.g., Camenisch, 451 U.S. at 398; Clay, 626 F.2d at 347; Banks, 554 F.2d at 128–29.

Second, individual plaintiff Stafford has already obtained a PPP (see Pl's Mem. (DE 21) at 22), and thus would have no need to obtain another PPP in the future. Plaintiffs' claim for injunctive relief is mooted in this additional respect. See SAS Inst., Inc., 874 F.3d at 389; see, e.g., Camenisch, 451 U.S. at 398; Clay, 626 F.2d at 347; Banks, 554 F.2d at 128–29. Further, the complaint alleges no other facts pertaining to other individuals who may seek to obtain a PPP. Upon mooting of the injunctive relief claim of plaintiff Stafford, the organizational plaintiffs lack standing to assert their claim for injunctive relief on the basis of the present allegations in the complaint. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 and n. 9 (1977).

Finally, the relief sought in the injunction is no longer relevant and it is overbroad, in that it would provide no meaningful relief under current circumstances. Plaintiffs' claim for injunctive relief violates the principle of "framing of relief no broader than required by the precise facts." Friends of the Earth, Inc., 528 U.S. at 193. Thus, the court lacks both a jurisdictional basis and an equitable basis to award the injunctive relief claimed.

---

[4]   Citations to the record including a docket entry (DE) number designate the page number specified by the court's electronic case filing (ECF) system and not the page number showing on the face of the underlying document, in the event of a discrepancy between the two.

Plaintiffs argue that their case is not moot because defendant has not carried the "heavy burden" of proving "that the allegedly wrongful behavior could not reasonably be expected to recur." (Pl's Mem. (DE 21) at 22). This argument misses the mark for several reasons. First, the court is not dismissing the entire case as moot, and the court's holding is limited to plaintiffs' claim for injunctive relief. "[I]t is widely recognized that a claim for nominal damages precludes mootness" of the case as a whole. New York State Rifle & Pistol Ass'n, Inc. v. City of New York, New York, 140 S. Ct. 1525, 1536 (2020).

By contrast, defendant's change in policy in response to a court order renders moot plaintiffs' claim for injunctive relief under the circumstances presented. See Cent. Radio Co. Inc. v. City of Norfolk, Va., 811 F.3d 625, 631–32 (4th Cir. 2016) (holding that "plaintiffs' request for prospective injunctive relief is moot, because the challenged language of the former sign code . . . is no longer in force," and noting that where defendant "amended the former sign code to comply with [a] Court's decision . . . we are confident that there is little likelihood that the City will re-enact the prior version of the ordinance).

In any event, as set forth above, individual plaintiff has already obtained all the relief she sought in her claim for injunctive relief, and she will not have a need to obtain again a PPP permit. Thus, even if dismissal of the claim for injunctive relief leaves "the defendant . . . free to return to his old ways," Friends of the Earth, Inc., 528 U.S. at 189, plaintiffs' claim for injunctive relief is moot where premised upon individual plaintiff's alleged Second Amendment violation.

In sum, plaintiffs' claim for injunctive relief must be dismissed as moot.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss (DE 16) is GRANTED IN PART and DENIED IN PART. Plaintiffs' claims for violation of state law and for injunctive relief are

16

DISMISSED WITHOUT PREJUDICE. Plaintiffs' remaining claims are allowed to proceed, including plaintiffs' claims for nominal damages under 42 U.S.C. § 1983 (first claim), and associated claims for declaratory relief and attorney's fees.

The court LIFTS the stay entered April 29, 2020, and an initial order regarding planning and scheduling shall follow, including direction for conduct of Rule 26(f) conference and filing of joint report and plan by the parties. In anticipation thereof, and in light of the procedural posture of this case, the court DIRECTS the parties to include in their Rule 26(f) conference, and corresponding joint report and plan, discussion of whether the parties wish to set aside time in the schedule of the case at this juncture for alternative dispute resolution, in lieu of entry of a case management order governing completion of discovery and additional motions practice. Thereupon, the court will make such further order regarding scheduling as is warranted.

SO ORDERED, this the 18th day of February, 2021.

                                            _____
                                            LOUISE W. FLANAGAN
                                            United States District Judge